Nick, please record. My name is Jeffrey Heron. I direct the Valparaiso University Law School Immigration Clinic. And I'm very pleased to present Mona Lisa Duguay. She's a third year law student at Valparaiso, and she'll be presenting our argument this morning concerning firmer settlement. And I'll be back for the rebuttal. Right. Ms. Duguay, whenever you're ready, you can begin. May it please the court. This case is not about credibility. Ms. Naizghi has already established a well-founded fear of persecution on account of her religion as a Pentecostal Christian. The principal issue before your honors this morning is whether Ms. Naizghi, while in Italy, was firmly resettled. In addressing that question, your honors, I will focus my argument on three main points. First, that the board erred in finding that the government met its burden to present prima facie evidence of firm resettlement. Because Ms. Naizghi, all she ever had while in Italy was a two-year temporary and contingent work permit. Second, the board erred in not even considering whether Ms. Naizghi had rebutted the government's supposed evidence. Because with her temporary work permit, had she stopped working, your honors, she would be deported. And third, the board failed in applying its own four-part test analysis that it took the time to craft in addressing the issue of firm resettlement. And that it never even reached the third and the fourth prong of that four-part test. R.J., would you tell those people to move away from the floor? We want to hear what you say, and they're distracting, so I'm sorry to interrupt you. Okay. Thank you, your honors. Go ahead. Continue. Go ahead. In the matter of AGG, which the government has already conceded is the appropriate test in this particular matter, your honors, the board took its time and carved out a four-part test to address the issue of firm resettlement. And the reason they did that is because there were various results in addressing the issue of firm resettlement throughout the circuits. So to provide us with a uniform approach, they took the time, carved out a four-part test, and in the first prong, the board said it's the government's burden to present prima facie evidence to show that there was a firm offer of permanent resident status, citizenship, or some other form of permanent resettlement. At the second prong, the applicant has an opportunity to rebut that evidence to show that no such offer was made or that the individual's circumstances precluded them from taking advantage of such an offer if that offer was so made. At the third prong, there is a totality of circumstances test, which is pretty much like the one that was fronted up in Mussie that this court decided, your honor, back in 99. And at the fourth prong, at the fourth prong, there are two regulatory exemptions that if the court was so inclined to accept the government's argument that there was a firm resettlement that had taken place after examining the first, second, and third prongs, even at the fourth prong, the applicants still have an opportunity to rebut that to show that one of the two regulatory exemptions applied. The first one is whether or not the applicant, in entering the third country, remains so long as to make necessary arrangements for onward travel to the United States, which is specifically what transpired in this case. The second prong says that if the government of the third country substantially and consciously restricted the individual's ability to firmly resettle, and if that prong applies, then she has not been firmly resettled, which also applies in this case. Okay. You knew you were going to get interrupted. Here's my question. When I just look at the term firm resettlement, it doesn't say citizenship. It doesn't say permanent residence. It just says firm resettlement. And when I look at this case where she's lived in Italy for 14 years, that to me, without regard to the case law, indicates a firm resettlement. She's lived there for 14 years. So, it makes me wonder when Congress uses the term firm resettlement. They mean something short of citizenship. They mean something short of seeking permanent citizenship. Because they could have easily said citizenship or applying for citizenship. Yes, Your Honor. The board – that is true, Your Honor. Congress did not say that specifically, which is why they vest the board with the authority to be able to interpret the statute which governs them. And the board, in interpreting the firm resettlement statute, says in their regulation, firm resettlement is defined as an offer of permanent residence status, citizenship, or some other form of permanent resettlement. So, that language came from the board itself. And so, which is why we're here, Your Honor. Had the board followed its four-part analysis in the matter of AGG, where they parsed out the language of the regulation. But wasn't that language, that regulation, in existence before firm resettlement was used by Congress in this context? Pardon? Wasn't that regulation in effect previously before Congress used the term firm resettlement in this context? Weren't those regulations drafted with another situation in mind? Well, that is true, Your Honor. But the practice has been both at the court level and at the board level to interpret that particular statute that you're talking about, Your Honor, as an opportunity for the government to show that there was, in fact, evidence, direct or indirect evidence, to establish firm resettlement. And the board has said in the matter of AGG, Your Honors, that when utilizing indirect evidence, it must be a sufficient level of clarity and force to show that the applicant was, in fact, able to permanently reside. What the government has presented as indirect evidence, Your Honor, are three things. They offer this temporary work permit, which everyone has already agreed was a temporary work permit. They offered this naturalization provision, Your Honor, for citizenship. And then they offer her stay there. Well, in addressing the first point, temporary work permit, Your Honor, no matter how many times you add temporary, temporary plus temporary plus temporary, I'm no math whiz, but I'm sure it equals to temporary. It doesn't ripen into permanent status, Your Honors, by mere fact that she was there for a substantial amount of time. This is not property law where we're dealing with adverse possession claim where after a statutory period. But after she was there for, going to the second factor, after she was there for 10 years, and she was there 10 years plus four, there was the legal mechanism in place. You're correct, Your Honors. There is a naturalization provision that the government talks about. It is an illusion at best, Your Honors. The naturalization provision in and of itself does not tantamount to an offer of permanent status. Why? Because in the naturalization provision, it requires, among many things, fingerprint requirements. The fingerprint requirements she has testified, and the immigration judge and the Board of Immigration Appeal has accepted her testimony as credible. There was no question whatsoever as to her testimony. She testified, and even at the credible fair interview, she said there as well, it would have necessitated a return trip back to Eritrea. Well, we already know that she has established a well-founded fear of persecution if she returned to Eritrea, which did in fact happen when she did return to Eritrea. Did she apply for the citizenship after the 10 years, and was she denied? Correct, Your Honor. She applied for asylum first. She was denied, as are 98% of Eritreans in Italy. She applied for naturalization provision. She applied for a passport, and then she applied for citizenship. She was denied. She was denied to formally resettle. What was the basis for the denial after the 10 years? She would have needed to go back to Eritrea, Your Honors, to be fingerprinted. Is that – are there – in the record, is there some documentation of the denial and that that was the reason? Yes, Your Honors. In the record, she testified that this is what transpired, and the – Is that the only thing in the record? There's not like the denial documentation? There's not a denial documentation, Your Honor. What are the records? Pardon? Where are the records? The records for – What are you talking about? You said it's based on her testimony. Where are the records about these applications and denials? Well, she – In Italy? She does not have a tangible record, if that's what you're asking, Your Honor. She does not have tangible records. And it was the government burden to show that there was an offer. All they provide is this naturalization provision. That does not carry with it sufficient level of clarity in the report. 98% of Eritreans were denied. Is that in this record? That is in the record, Your Honor. That's in the country conditions. That's also in the – The country conditions report from our State Department? Correct, Your Honor. And that is part of the record, and the government did accept those as credible evidence. We also have in there an affidavit from a professor who also talked about the country conditions in Eritrea, and that's all part of the record, Your Honor. And with respect to the information regarding the naturalization provision, that's in there as well. Her testimony is part of the record, and it was accepted as credible. And going to the time that she remained there, Your Honor, she was there for 14 years, and she came to Italy as a result of her father and her brother being persecuted. After residing in Italy, she was gang-raped by patrons at her place of employment. They came to her home at gunpoint, Your Honor, and threatened to kill her if she was to disclose this information to anyone. In fear of her life, she ran to the only place she had left, not because she wanted to because she was in fear of persecution, but she had nowhere to go. This is a woman who is living in limbo and who has been living in limbo since entering Italy and since entering here. She returned back to Eritrea, and what transpired, what she had feared, she was in fact persecuted. She was attacked. She was tortured. She was beaten by the Eritrean government. They took her into custody, and she remained there for eight days only after she was able to, through friends and family, bribe her way out of there and then she returned to Italy. That's the period we're asking Your Honors to look at, the nine-month period that she remained in Italy so long as to make the necessary arrangements to travel on to the United States. When she got to Italy, she was able to work and try to get a sufficient amount of finances to purchase her visa and got out of there as soon as she possibly could. Yes, it took nine months, but when you're working at $4 an hour and you are impoverished and you are relying heavily… If you're counting the second time, yes, Your Honor. Two periods, 14 years, three months back in Eritrea, and then nine months back in Italy? Correct, Your Honor. And since that time, she's been in the United States? She's been in the United States since 2009, Your Honor. That's right. She first went to Italy in 1994. Correct, Your Honor. And yes, she was there for a long time, but we must look at the language of the statute. It says that there must be an offer of permanent resident status. Let's remember, the entire time that she was there, she always held a temporary resident, which required that she work at all times. Otherwise, she would be deported. So there was restrictions there, Your Honor. You and I can wake up tomorrow and decide we don't want to go to work, Your Honor. She was always able to renew it. She was always able to renew it. That is true, every two years, so long as she maintained employment and she continued to pay her taxes. So how many separate work permits did she have? I beg your pardon, Your Honor? Seven or eight? How many work permits did she have all the time she was over there? Seven or eight? She renewed it every two years. She renewed it every two years, yes. And renewed it every two years? Yes, sir. And she was there about 15 years? She was there about 15 years. And it was still temporary status. That's the key, Your Honor. It was still a temporary work status. But that doesn't preclude firm resettlement under that regulation that you just read us. Well, it does, Your Honor, because it says that the offer that the applicant received must be one that is of permanent resident status, citizenship, or some other form of permanent resettlement, and she never had that. She always had a temporary work permit, which is a temporary status that required that she work or she would be deported. And this is someone who, Your Honor, looking at the totality of the circumstances, she has not been firmly resettled. This is someone we are asking, Your Honor, to give her an opportunity to find a home. She does not have a home. The asylum was designed through the International Refugee Convention specifically for people like Ms. Natsky, someone who doesn't have anywhere to go. She went to Italy. She tried to make Italy her home, and she couldn't do that because they denied her and they rejected her. She can't make it her tree or her home because she went there and she was persecuted. She's here in the United States, Your Honor. All she's asking for is to remedy the defect that the government created in their finding. They failed in their analysis. They never went through their analysis properly. They take their time, carve out this test, and they pretty much came to an arbitrary and capricious conclusion as to why she was firmly resettled. Thank you, Your Honor. I'm sorry. But you've got some more time for me. Let's hear from Ms. Farrell, and then you can come back and complete your argument. You're out of time. I reserve my time for rebuttal. Thank you, Your Honors. Ms. Farrell? Good morning, Your Honors, and may it please the Court. Corey Farrell on behalf of the Attorney General. The Supreme Court has explained that Congress never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives. That is the situation we have here. Ms. Nosky left Eritrea for Italy in 1994, where she remained continuously for 14 years. During this time, she lived and worked legally in Italy, traveled freely, was able to leave Italy and reenter without any problem, had access to medical care, and was eligible for citizenship. After considering these and other factors, the agency properly determined that Ms. Nosky… She wasn't eligible until she went back home. So, she started the process there. Her testimony was that she needed to return to Eritrea and be finger-printed. Is there any indication in the record that she did not, in fact, have to return to Eritrea in order to complete her application for citizenship? I believe the Italian citizenship provisions that Ms. Nosky submitted as an addendum to her brief here makes no mention of a requirement that you actually return to your country of citizenship to get those documents completed. It just says you must submit the documents. So, we only have her testimony that she was actually required to return to Eritrea. Do we know what the Italian law is? No, Your Honor, we don't know what the Italian law is. It was not submitted below. Isn't it the government's burden to show that citizenship was available to her? And the respondent's position is that the government met its burden, its prima facie burden of establishing firm resettlement. Here, there was no direct evidence because, as was mentioned, there are no documents in the record. Ms. Nosky testified that after she entered the United States, all of her documents were stolen. So, here, the agency looked at indirect evidence of firm resettlement, and it considered many factors, including her 14-year residency, which this court in Musi said a duration of residence can be sufficient to satisfy the government's prima facie showing of firm resettlement. But the agency did not just consider her lengthy residence. It also considered her work permit. Her temporary work permit. That was renewed every year. But was – is it a fact that the work permit was conditioned on continued employment? That was her testimony, yes. But, no, isn't that – is that the fact? I understand that that was her testimony, but what does the government say about that? As the board stated, the immigration judge rejected her contention that her status was only temporary. And she did testify that at times she wasn't working, and she was able to renew her work permit by paying taxes. So, we don't know how, in fact, Italian law would treat this temporary work permit? Is that what you're saying? That's – we don't know exactly. So, why didn't we remand? Well, Your Honor, if you determine that the board needs to further consider Italian law and gather more information, then, yes, I believe you should remand. But this court is not the proper place to consider Italian law in the first instance that – and this was not submitted. The board or the IJF should consider it first? That's correct, and it would be the immigration judge. How do you all establish it? Well, the Third Circuit in Abdeel, Abdel, kind of talked about this problem, and they remanded that case for consideration of South African law. And they said that you could submit expert testimony, and I know that the Library of Congress has reports on different law. But the agency never considered – was never presented with portions of Italian law here. And the response position is that the government – I remember we had one here a couple years ago where they came up here and they had competing experts on the foreign law. Right. And that's why it would need to be remanded. So, that's what's done sometimes? That is – I have seen that done before, Your Honor. And that would go back to the immigration judge because those would be factual issues that the immigration judge would have to analyze. Or you all could agree on what the law is in the court. If you agreed right here, we could consider it then? No, Your Honor, because – You still have to go back. It would still have to go back, unfortunately. But the response position now is that the government met its prima facie burden of proof by considering numerous factors – her eligibility for citizenship, her work permit, her lengthy residence, ability to change employers. Some work permits are tied to specific employers, but she was able to change employers, obtain housing, medical care, travel freely. She reentered Italy without any problem. But even though she was able to change employers, the work permit was still tied to employment. That's correct. Although she did testify that she was able to renew it at times when she was not working. Well, let me ask you this. When she seeks asylum here in this country, she's lived in Italy for a long time. She says, I couldn't get a permanent citizenship there because I had to go back home to be fingerprinted. But then eventually she does go back home after allegedly being gang raped, and she does not apply then for becoming an Italian citizen. Doesn't that show that she has no intention of becoming a resident or becoming firmly resettled in Italy after what's happened to her? She wants to get up. She can't live at home. She doesn't want to become firmly established in Italy given what's happened to her. And she's had the opportunity to get the citizenship because she's been back home. She could have gone to the embassy and applied. Doesn't that show that she's not firmly established or resettled? It shows that she would rather come to the United States, Your Honor. Well, it shows that she doesn't want to live in Italy. Right. And several cases have talked about that the firm resettlement bar prevents country shopping, as you will. They use that term. Well, I don't call being gang raped a grounds for choosing which country. No, Your Honor, but she did not apply for asylum from Italy when she came here. Gang raped? No, when she came here, she did not apply for asylum from Italy. She doesn't want to because she's been at home. And that was the only thing apparently keeping her, according to the government's view, from applying for citizenship. Returning to? Eritrea. Eritrea. And the board in matter of AGG specifically addresses this. It states that if there's a legal mechanism to obtain permanent residence, the petitioner must take advantage of that to show that the firm resettlement bar doesn't apply. And then, so that's what the government showed here, that she was eligible. She testified herself that she was eligible. And then she can rebut that showing by showing she would not have been eligible or granted citizenship. And she did not present that at any Italian law or cases showing that she would not have been granted if she had completed all the documents. So, under the board's statements in matter of AGG, the government met its prima facie case and then the burden shifted to Ms. Nosky to rebut that evidence. And then, in addition, there are the exceptions to the firm resettlement bar. And our position is that she did not show that either of those exceptions applied. Are there no further questions? The government will rest. Okay, thank you, Ms. Carroll. All right, Mr. Herent. Thank you, Your Honors. With regard to the first point that you had made during our opening as to whether the statute itself contains any language with regard to citizenship or permanent residence status, it's true that the statute doesn't use that language. That being said, it is an elementary principle of administrative law that the government must be held to its own regulation. If they want to change that regulation, they can do so, but they have to follow a process. That process hasn't been gone through here. All we have here is the test that the government set out in AGG. We have a regulation with very clear language and very clear requirements. And Ms. Nosky certainly has – simply has not been firmly resettled under the language of that regulation because there is no evidence that there was an offer. Now, with respect to the question of citizenship and whether that was an offer, it's important to stress that this was the government's burden. It was their burden to show at the outset that citizenship constituted an offer for Ms. Nosky. What did they present to show that this was an offer? They presented her own testimony that she had been denied citizenship. Now, that simply cannot meet the government's burden. They could have come in with, as you said, their own experts on Italian law. They could have, at the very least, at the minimum, submitted the Italian naturalization provision, some case law, some Italian regulations. They didn't do any of those things. All they did was rely on Ms. Nosky's own testimony. So, with respect to your question as to whether this case should be remanded for some assessment of Italian law, it absolutely should not be remanded for that purpose because the evidence in the record is clear. It was unrebutted. The government had its opportunity to rebut Ms. Nosky's testimony, to dispute it. It never did so. This court has a clear record on this matter. That record shows that Ms. Nosky, while she was in Italy, had a temporary work permit. She was eligible for naturalization after 10 years. She applied. That application was rejected. And the reason why it was rejected was that she didn't have a document that would have required her to return to Eritrea. Now, just by way of explanation as to what we think that was, we think that that was likely a requirement that she present a criminal record check. There is a provision, which you can clearly find on the Italian government's own website, that lays out these requirements and it indicates that it is necessary to present proof of a lack of criminal record. So, we think that likely what this requirement of being fingerprinted was, was that she had to go back to Eritrea, get fingerprinted in order to show that she had no criminal record, and take that document to the Italian embassy to be authenticated. Now, in addition to this requirement, it's also important to note that citizenship in Italy is ultimately discretionary. And the government actually concedes that in their response brief. So, even if Ms. Nosky had obtained this document, at the end of the day, her application could have been denied. It also could have been denied because she was unable to meet a financial sustainability requirement. Now, the government contends that we, this issue of the financial sustainability requirement, isn't properly before the court because it's a matter of Italian law. It's important to remember that this court sets its own rules as to what it can and cannot consider with respect to foreign law. And the rule of this court, the relevant rule is Rule 44.1 of the Federal Rules of Civil Procedure, which says that foreign law is a legal issue. So, this court has the power to look at the Italian law and make determinations of Italian law. This is not an issue of fact that requires expert testimony. And at the end of the day, expert testimony isn't required anyway because the facts, as set forth in the record, are undisputed and established that the government did not meet its burden of proof. One final point. Counsel suggested that Ms. Nosky was essentially foreign shopping, that she did not apply for asylum from Italy while she was in the United States. Again, that would have been improper under immigration law because you can't apply for asylum from a country from which you're not a national. Ms. Nosky is a national of Eritrea and a citizen of Eritrea, not, again, a citizen or national of Italy, which is why she wasn't firmly resettled and why her asylum application in this country from Eritrea was proper and should have properly been granted. So, we ask that this court reverse the Board of Immigration Appeals and allow Ms. Nosky to obtain the home in the United States that she has fought so hard for. Thank you very much. All right, we'll come down and recounsel and take a break for about 10 minutes.
judges: William B. Traxler, Jr., Robert B. King, Stephanie D. Thacker